1999-NMCA-102

986 P.2d 468

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Vincent LUCERO, Anita Guilez, and Gilbert Salcido, Defendants–
Appellants.**

**Nos. 19,168, 19,169, 19,170.**

Court of Appeals of New Mexico.

May 7, 1999.

Certiorari Denied, No. 25,784, July 15, 1999.

Patricia A. Madrid, Attorney General, Steven S Suttle, Assistant Attorney General, Santa Fe, NM, for appellee.

Phyllis H. Subin, Chief Public Defender, Susan Gibbs, Assistant Appellate Defender, Santa Fe, NM, for Guilez & Salcido, appellants.

Jesse R. Cosby, Roswell, NM, for Lucero, appellant.

## OPINION

BUSTAMANTE, J.

{1} Vincent Lucero, Anita Guilez, and Gilbert Salcido (referred to collectively as Defendants) each appeal their convictions for one count of receiving stolen property over $2500, in violation of NMSA 1978, § 30–16–11(G) (1987). Defendants were tried jointly in a second trial, after the first proceeding ended in a mistrial. Defendants' appeals were consolidated by this Court. Defendants raise the following issues on appeal: (1) whether double jeopardy barred a retrial after the mistrial; (2) whether the trial court erred in failing to grant a mistrial as a result of the prosecutor's attempt to introduce evidence of an unrelated crime; (3) whether the trial court erred in refusing to allow Defendants to cross-examine the prosecutor's informant about an alleged forgery; (4) whether the trial court's comment on Defendants' admission of a photograph exhibit deprived Defendants of a fair and impartial trial; and (5) whether the trial court erred in ordering Defendants to pay restitution in an amount representing the full retail value of the merchandise recovered. We affirm.

## I. FACTS

{2} Randall Matlock, manager of J.C. Penney in Roswell, initiated an investigation after he noticed that shipments to his store were consistently missing merchandise. About the same time, Detective Clifton Frosch of the Roswell police department received information from an anonymous caller that Kenneth Allison, a delivery truck driver for Merchant's Freight Company, was making frequent deliveries to a Roswell residence belonging to Defendants Guilez and Salcido. Detective Frosch and other officers followed Allison's truck to this residence and observed Allison unloading several boxes. After Allison drove away, he was stopped and arrested. The police determined that Allison had been embezzling J.C. Penney merchandise from his employer. During a search incident to the arrest, officers also found cocaine in Allison's hat band.

{3} Detective Frosch obtained a search warrant and conducted a search of Guilez's and Salcido's residence, seizing several boxes of clothing. Lucero was Guilez's third cousin and occasionally stayed with Guilez and Salcido. All three Defendants were arrested and charged with receiving stolen property over $2500. Matlock participated in catalog-

ing the seized items and identified most of the seized property as the missing J.C. Penney merchandise.

{4} Detective Frosch and the prosecutor agreed to reduce Allison's sentence if he informed them about Defendants' participation in receiving the J.C. Penney merchandise. According to Allison, in exchange for his testimony he pleaded guilty to one misdemeanor, one petty misdemeanor, twelve fourth-degree felonies and six third-degree felonies. He received a six-year sentence, with all but 364 days suspended, and an agreement that the sentence could be served on work release. Ultimately, Detective Frosch decided the State would not prosecute Allison for any crimes arising out of the distribution of stolen J.C. Penney merchandise to persons other than Defendants.

{5} The case was first brought to trial on October 15, 1997. At the beginning of the trial, defense counsel received a report from the Dexter police, indicating that Yolanda Alvarez had delivered two boxes of clothing to the police on October 9, 1996, which she claimed she received from Allison. The prosecutor stated that he had not seen the Dexter police report prior to that morning of trial. Defendants moved for a continuance to subpoena and interview Alvarez. The motion was to be heard during the noon recess of the first day of trial, outside the presence of the jury.

{6} Prior to the motion hearing, Dexter Police Chief Carlos Barela and Detective Frosch both testified. Chief Barela testified that he participated in a consent search of Alvarez's home and a warrant search of Allison's mother's home in Dexter. He stated that he received other property from Antonio Salaz, who claimed to have received the property from Allison. He indicated that all of the property was turned over to Detective Frosch at the Roswell police department in October 1996.

{7} During Detective Frosch's testimony, defense counsel discovered that there were two search warrants that had not been disclosed which were executed in an attempt to locate other missing merchandise in the Dexter area. The search warrants revealed witnesses who potentially knew of other criminal conduct by Allison. Detective Frosch testified that he provided the warrant, its return, and the inventory to the district attorney's office. Apparently, the prosecutor had approved the affidavits filed in support of the search warrants. Detective Frosch stated that he did not disclose this evidence because he did not believe it pertained to Defendants' case.

{8} Defendants moved for a mistrial as a result of the State's failure to disclose the search warrants and returns. Defendants asserted that both situations involved Allison's embezzlement of J.C. Penney merchandise from his employer and his disposal of that merchandise. Defendants also argued that this information bore on Allison's credibility because it rebutted Allison's claim that only Defendants had received stolen property from him. The trial court continued the trial to allow defense counsel to interview and subpoena these potential witnesses. Because of Matlock's unavailability the following day, the trial court allowed him to testify before the jury was excused.

{9} When the trial resumed the following day, October 16, 1997, the State disclosed that during the overnight continuance it discovered a second statement in Allison's file at the district attorney's office. The statement had been taken on October 31, 1996, by Detective Frosch. Defendants moved for a mistrial due to the late disclosure. Defendants argued that the statement was inconsistent with Allison's other statements concerning who originated the idea of trading merchandise for cocaine, and to whom else Lucero gave or sold merchandise. It also included for the first time, the name of another Dexter resident, Irma Medrano, who allegedly purchased merchandise from Allison. The trial court read Allison's statement, noting that it was the statement upon which his plea was based, and granted Defendants' motion for a mistrial.

{10} Prior to the retrial, Defendants moved to dismiss the charges on double jeopardy grounds. The trial court denied the motion, finding that although it could not condone the discovery violation, it did not rise to the level of bad faith and was not

calculated to put the State in a better position to convict. The case proceeded to a second trial. At the second trial, Lucero testified that he gave Allison permission to store his personal property at the house because Allison claimed he was getting a divorce. Guilez and Salcido testified that they gave both Lucero and Allison permission to store their personal property at their home. All three Defendants denied any knowledge that Allison was storing stolen property at the house. Defendants were convicted of receiving stolen property over $2500. We summarize additional facts as we address the specific issues on appeal.

## II. DISCUSSION

### A. DOUBLE JEOPARDY

{11} Defendants contend that after the first trial ended in mistrial, retrial should have been barred due to prosecutorial misconduct. Before addressing the State's preservation argument, we take this opportunity to clarify how the New Mexico standard on the double jeopardy bar to retrial for prosecutorial misconduct evolved.

### 1. How the New Mexico Standard Evolved

{12} Like *State v. Breit*, 1996–NMSC–067, ¶ 14, 122 N.M. 655, 930 P.2d 792, this case "focusses on trials that are terminated, nullified, or reversed at the defendant's behest, not mistrials that are declared sua sponte by the court." In this regard, we note that the parties' citations to case law, both at the trial level and on appeal, concerning the "manifest necessity" standard for mistrials declared sua sponte by the trial court are inapplicable to the facts of this case. *See, e.g., State v. Messier*, 101 N.M. 582, 585, 686 P.2d 272, 275 (Ct.App.1984) (determining whether trial court's sua sponte declaration of a mistrial was a manifest necessity such that retrial is not barred). Here, Defendants moved for a mistrial in the first trial, and then moved for dismissal on double jeopardy grounds because of prosecutorial misconduct at the first trial.

{13} The general rule is that "[a] motion for mistrial by defendant ordinarily removes the barrier to reprosecution. An exception occurs where the motion is the result of prosecutorial overreaching." *State v. Mazurek*, 88 N.M. 56, 59, 537 P.2d 51, 54 (Ct.App.1975) (citation omitted). Prior to *Breit*, New Mexico based its double jeopardy standard, as announced in *State v. Day*, 94 N.M. 753, 757, 617 P.2d 142, 146 (1980), on "an amalgam of various pronouncements by the United States Supreme Court." *Breit*, 1996–NMSC–067, ¶ 26, 122 N.M. 655, 930 P.2d 792. Under the standard adopted in *Day*, the double jeopardy bar to retrial is triggered where "the prosecutor engaged in any misconduct for the purpose of precipitating a motion for a mistrial, gaining a better chance for conviction upon retrial, or subjecting the defendant to the harassment and inconvenience of successive trials." *Day*, 94 N.M. at 757, 617 P.2d at 146. Consequently, "double jeopardy attaches where the prosecutor, rather than risking an acquittal, purposely creates a situation necessitating a mistrial (or a reversal) in order to create a more favorable climate for conviction upon retrial ." *Id.* Typically, the type of prosecutorial misconduct triggering the double jeopardy bar to retrial is conduct that occurs during trial and is intended to cause a mistrial because the prosecutor does not think the trial is proceeding favorably. *See, e.g., State v. Mestas*, 93 N.M. 765, 767, 605 P.2d 1164, 1166 (Ct.App.1980) (emphasizing "that the actions of the prosecutor ... must have been designed to afford the prosecution a more favorable opportunity to convict in the trial at which the mistrial motion was made"). "This misconduct may be motivated by a desire to avoid acquittal by intentionally creating circumstances that require a new trial in the hopes of obtaining a more favorable climate for conviction the second time around." *Breit*, 1996–NMSC–067, ¶ 16, 122 N.M. 655, 930 P.2d 792,.

{14} Following *Day*, the United States Supreme Court in *Oregon v. Kennedy*, 456 U.S. 667, 679, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), narrowed the bar to reprosecution by requiring that the prosecutor's conduct be intended to provoke the defendant into moving for a mistrial. *See Breit*, 1996–NMSC–067, ¶ 16, 122 N.M. 655, 930 P.2d 792,. "Thus, the federal cases upon which we

based our double-jeopardy rule in *Day* were narrowly restricted by *Kennedy* to a rule based upon prosecutorial intent." *Id.* ¶ 26. Under *Kennedy*, if prosecutorial misconduct "is not intentionally designed to 'provoke the defendant into moving for a mistrial,' then reprosecution is not barred." *Id.* ¶ 17 (citation omitted).

{15} Our Supreme Court in *Breit* decided not to adopt the approach announced in *Kennedy* in interpreting our state constitution. *See id.* ¶ 26. The Court stated that the view adhered to in *Kennedy* "improvidently failed to weigh the effects of the misconduct of prosecutors who do not subjectively intend to provoke a mistrial." *Id.* ¶ 18. The Supreme Court said that while there may not always be an intent to provoke a mistrial, the prosecutor's misconduct may be so egregious that double jeopardy protections must attach. *See id.* ¶ 21.

■ {16} However, the Supreme Court emphasized that it was not overruling the *Day* standard. *See id.* ¶¶ 3, 36. To the contrary, the Court "interpret[ed] *Day* to be describing instances of misconduct in which the prosecutor acts in willful disregard of the resulting mistrial, retrial, or reversal on appeal." *Id.* at ¶ 3. Thus, the *Breit* test was intended to encompass the instances of conduct implicated by the *Day* standard. *See id.* ¶¶ 32, 36. *Breit* held that while a prosecutor's egregious conduct may be motivated by interests other than intentional provocation of a mistrial, it may nevertheless be sufficient to bar retrial. *See id.* ¶ 36.

{17} We believe the purpose behind the expanded *Breit* test is best articulated by Justice Steven's concurring opinion in *Kennedy*, where he identifies the factual scenarios that would not meet the *Kennedy* rule:

> "For example, a prosecutor may be interested in putting the defendant through the embarrassment, expense, and ordeal of criminal proceedings even if he cannot obtain a conviction. In such a case, with the purpose of harassing the defendant the prosecutor may commit repeated prejudicial errors and be indifferent between a mistrial or mistrials and an unsustainable conviction or convictions. Another example is when the prosecutor seeks to inject enough unfair prejudice into the trial to ensure a conviction but not so much as to cause a reversal of that conviction. This kind of overreaching would not be covered by the Court's standard because, by hypothesis, the prosecutor's intent is to obtain a conviction, not to provoke a mistrial. Yet the defendant's choice—to continue the tainted proceeding or to abort it and begin anew—can be just as 'hollow' in this situation as when the prosecutor intends to provoke a mistrial."

*Breit*, 1996–NMSC–067, ¶ 21, 122 N.M. 655, 930 P.2d 792 (quoting *Kennedy* 456 U.S. at 689, 102 S.Ct. 2083 (Stevens, J., concurring) (footnotes omitted)). In applying *Breit*, it is important to keep in mind how the standard evolved and the intent of our Supreme Court in fashioning an expanded interpretation of our state constitution's double jeopardy clause.

## 2. Defendants' Preservation of the State Constitutional Claim

■ {18} Under New Mexico law, "[t]he defense of double jeopardy may not be waived and may be raised by the accused at any stage of a criminal prosecution, either before or after judgment." NMSA 1978, § 30–1–10 (1963). Therefore, Defendants may raise their state-based double jeopardy claim for the first time on appeal, provided the factual basis for the state constitutional argument can be found in the record of proceedings below. *See State v. Jensen*, 1998–NMCA–034, ¶ 18, 124 N.M. 726, 955 P.2d 195 ("When a case is assigned to a general calendar, the factual basis for the issues must be contained in the record of proceedings made below," otherwise the double jeopardy claim must be rejected.). While the parties' trial briefs below incorrectly cite case law concerning the double jeopardy standard as it applies to a mistrial declared sua sponte by the trial court, it appears the trial court properly decided Defendants' double jeopardy claim under the standard for prosecutorial misconduct. *See Mestas*, 93 N.M. at 767, 605 P.2d at 1166 (stating "that the actions of the prosecutor must have been in bad faith, and must have been designed to afford the prosecution a more favorable opportunity to con-

vict in the trial at which the mistrial motion was made"). Moreover, because the parties do not disagree about the factual circumstances surrounding the prosecutor's untimely discovery disclosure, we can decide whether retrial was barred as a matter of law under *Breit.*

▓▓▓▓ {19} In addition, the State asserts that unlike Guilez and Salcido, who raised the state constitutional argument for the first time on appeal, Lucero did not, at any time, assert his rights under the double jeopardy clause of the New Mexico Constitution. We disagree. Defendant Lucero's brief-in-chief argues that retrial should be barred under *Breit* and *State v. Huff,* 1998–NMCA–075, 125 N.M. 254, 960 P.2d 342, both of which involve the state constitutional bar to reprosecution. This was sufficient to preserve the issue for our review on appeal. If the State is referring to Lucero's failure to raise the state constitutional argument in the docketing statement, we are not persuaded. Once a case is assigned to the general calendar, parties may raise for the first time in the brief-in-chief arguments not raised in the docketing statement. *See State v. Salgado,* 112 N.M. 537, 538, 817 P.2d 730, 731 (Ct.App. 1991) (recognizing that after 1991 amendment to the rules of appellate procedure, "the docketing statement no longer governs the issues that may be raised on a non-summary calendar"). Consequently, we reject the State's preservation argument and proceed to the merits of the issue.

### 3. Breit Test

▓▓▓▓ {20} The three-part test articulated in *Breit* for determining whether double jeopardy bars reprosecution when a defendant moves for mistrial because of prosecutorial misconduct is as follows:

Retrial is barred under Article II, Section 15, of the New Mexico Constitution, when improper official conduct is so unfairly prejudicial to the defendant that it cannot be cured by means short of a mistrial or a motion for a new trial, and if the official knows that the conduct is improper and prejudicial, and if the official either intends to provoke a mistrial or acts in willful

disregard of the resulting mistrial, retrial, or reversal.

*Breit,* 1996–NMSC–067, ¶ 32, 122 N.M. 655, 930 P.2d 792. We apply the *Breit* test to the facts of this case and hold that double jeopardy did not bar retrial. In reviewing Defendant's double jeopardy claim, we are reminded that "[n]ot every prosecutorial error that leads to a mistrial or reversal will justify barring a retrial. On the contrary, it is a remedy to be used sparingly." *State v. Foster,* 1998–NMCA–163, ¶ 21, 126 N.M. 177, 967 P.2d 852.

### a. Cures Short of Mistrial

▓▓▓▓ {21} The first question is whether the prosecutor's conduct was so unfairly prejudicial to the defendant that it could not be cured by means short of a mistrial or a motion for a new trial. *Breit,* 1996–NMSC–067, ¶ 32, 122 N.M. 655, 930 P.2d 792. We cannot say that in this case the prosecutor's failure to disclose the existence of a second statement was so unfairly prejudicial to Defendants that it could not be cured by means short of a mistrial or a motion for a new trial. The second statement revealed the name of another witness, Medrano, who allegedly purchased clothing from Allison. Defendants assert that this was inconsistent with Allison's earlier statement that the only person he gave merchandise to was Lucero.

{22} There are remedies short of a mistrial for discovery abuses. Clearly, the State had a duty under Rule 5–501(A)(5) NMRA 1999, to disclose Allison's statement. *See id.* (requiring the State to disclose "a written list of the names and addresses of all witnesses which the prosecutor intends to call at the trial, together with any statement made by the witness"). And in preparing the State's case, the prosecutor should have been aware that Allison's file contained a second statement, particularly since it appears that the prosecutor directed Detective Frosch to take the statement. However, Rule 5–501 provides for less severe remedies for discovery violations than mistrial or a new trial. Specifically, Rule 5–501(H) states: "If the state fails to comply with any of the provisions of this rule, the court may enter an order pursuant to Rule 5–505 or hold the prosecutor in contempt or take other disciplinary action

pursuant to Rule 5–112." Rule 5–505(B) NMRA 1999, provides that if the court determines that the State failed to comply with the continuing duty to disclose discoverable information, "the court may order such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from calling a witness not disclosed, or introducing in evidence the material not disclosed." Rule 5–112 NMRA 1999, provides that an attorney who willfully fails to comply with the rules of criminal procedure may be held in contempt of court or be subject to disciplinary action.

{23} Defendants have failed to show why any prejudice resulting from the prosecutor's late disclosure could not have been cured by a remedy short of a mistrial. Medrano was apparently present and available for an interview on the morning of the second day of trial, when the prosecutor revealed the existence of the statement for the first time. Another short continuance could have been granted to give Defendants an opportunity to interview Medrano and determine how much time Defendants needed to investigate any new witnesses. Defendants could have attempted to voir dire Medrano to determine whether further investigation was necessary. Despite the fact that Defendants had ample time to pursue the matter prior to their second trial, they have failed to show why a continuance consistent with the court's trial schedule would not have sufficed to cure the State's error. Therefore, we hold that the first prong of the *Breit* test is not satisfied. Although failure to satisfy the first prong disposes of Defendants' double jeopardy argument, we proceed to address the other two prongs.

### b. Knowledge of Impropriety

{24} "This prong of the *Breit* test requires us to consider whether the prosecutor knew or can be presumed to have known that the conduct was improper and prejudicial." *Huff,* 1998–NMCA–075, ¶ 17, 125 N.M. 254, 960 P.2d 342. A prosecutor should know the rules of criminal procedure. In particular, the prosecutor should know that the rules require the State to provide the names of witnesses it intends to call, together with any witness statements, within ten days after arraignment or waiver of arraignment. *See* Rule 5–501(A)(5). Rule 5–505(A) also imposes a continuing duty to disclose once the prosecutor discovers the existence of additional material or witnesses. As an adjunct to the duty of disclosure, the prosecutor should be aware of the contents of the prosecution file.

{25} We note that the prosecutor in this case complied with Rule 5–505(A) by immediately notifying the court and defense counsel of his discovery of an additional statement in Allison's file. The prosecutor stated that he was negligent in not reviewing Allison's file before Defendants' trial and acknowledged that his negligence may possibly rise to bad faith. Assessing the prosecutor's conduct, the trial court found "there was negligence but not bad faith on the State, and I don't find that it was calculated to put them in a better position to convict." Nevertheless, it appears from the record that the prosecutor should be presumed to have known that Allison's statement was in his file and that the prosecutor knew that failing to provide defense counsel with any and all statements of their key witness prior to trial was improper under the rules of criminal procedure. Therefore, we believe that the second prong of the *Breit* test was satisfied.

### c. Willful Disregard

{26} Defendants do not appear to contend that the prosecutor intended to provoke a mistrial. Thus, "[i]n order for double jeopardy to bar retrial, the prosecutor must act in willful disregard of the resulting mistrial." *Huff,* 1998–NMCA–075, ¶ 22, 125 N.M. 254, 960 P.2d 342. "When that intent is absent, the misconduct necessary to bar a retrial must be extraordinary." *Foster,* 1998–NMCA–163, ¶ 21, 126 N.M. 177, 967 P.2d 852. In examining the prosecutor's conduct, we do so in light of the totality of the circumstances of the trial. *See Breit,* 1996–NMSC–067, ¶ 40, 122 N.M. 655, 930 P.2d 792. "Willful disregard" means either that the prosecutor was actually aware, or can be presumed to have been aware, of the potential consequences of his act or omission; in this case, of failing to provide Defendants

with any and all statements of witnesses they intended to call at trial. *See id.* ¶ 34.

{27} We fail to see how the prosecutor's misconduct can be characterized as willfully disregarding the likelihood that his error would cause a mistrial. The alleged misconduct by the prosecutor was the failure to disclose a witness's statement prior to trial, as required by the rules of criminal procedure. *See* Rule 5–501(A)(5); Rule 5–505(A). The mistrial was caused by the prosecutor's disclosure of the statement on the second day of trial. It is unlikely that on the second day of trial the prosecutor determined that a mistrial was needed to prevent acquittal and decided to disclose information that should have been disclosed prior to trial. There was no evidence that the prosecutor was aware of the statement prior to the time it was disclosed. While the prosecutor may have been careless in his preparation for trial, his notification to the trial court and defense counsel of the discovery of the statement demonstrates just the opposite, that the prosecutor wanted to avoid a mistrial by ensuring that Defendants were aware of all of the evidence in the State's possession.

{28} Moreover, the late disclosure does not appear to be the result of a plan or scheme to inject unfair prejudice into the trial. There has been no suggestion by Defendants that the prosecution sought a tactical advantage through the declaration of a mistrial. Nor does the record support an inference that the State sought to gain, or would gain, any tactical advantage from a mistrial. In addition, the mistrial came at a time when the State had presented just three witnesses, Chief Barela, Detective Frosch, and Matlock. The State's chief witness, Allison, had not yet testified. It was too early to evaluate the State's case. Furthermore, revealing the existence of the statement and identity of a witness who could undermine the State's chief witness's credibility only hampered the State's chance for a conviction. It does not make sense that the State, in an effort to avoid an acquittal, would reveal an undisclosed statement that might actually help Defendants' case. Finally, there is no indication that the prosecutor's purpose was to harass Defendants by putting them through the embarrassment, expense, and ordeal of a trial even if a conviction was unattainable.

{29} In evaluating what happened in this case, it is helpful to consider what Justice Stevens wrote in his concurring opinion in *Oregon v. Kennedy:*

> To invoke the exception for overreaching, a court need not divine the exact motivation for the prosecutorial error. It is sufficient that the court is persuaded that egregious prosecutorial misconduct has rendered unmeaningful the defendant's choice to continue or to abort the proceeding. It is unnecessary and unwise to attempt to identify all the factors that might inform the court's judgment, but several considerations follow from the rationale for recognizing the exception. First, because the exception is justified by the intolerance of intentional manipulation of the defendant's double jeopardy interests, a finding of deliberate misconduct normally would be a prerequisite to a reprosecution bar. Second, because the defendant's option to abort the proceeding after prosecutorial misconduct would retain real meaning for the defendant in any case in which the trial was going badly for him, normally a required finding would be that the prosecutorial error virtually eliminated, or at least substantially reduced, the probability of acquittal in a proceeding that was going badly for the government. It should be apparent from these observations that only in a rare and compelling case will a mistrial declared at the request of the defendant or with his consent bar a retrial.

456 U.S. at 689–90, 102 S.Ct. 2083 (footnotes omitted).

{30} "This case presents nothing like the extraordinary circumstances that would require barring a retrial." *Foster,* 1998–NMCA–163, ¶ 22, 126 N.M. 177, 967 P.2d 852. While the prosecutor should have been better prepared, there is nothing indicating that he acted in willful disregard of an impending mistrial. Any error by the prosecutor was not sufficiently egregious to bar retrial. We conclude that the third prong of the test is not satisfied. Consequently, we

hold that the declaration of a mistrial at Defendants' request did not bar Defendants' retrial.

## B. DID THE TRIAL COURT ERR IN DENYING A MISTRIAL BASED ON THE PROSECUTOR'S SOLICITATION OF INADMISSIBLE EVIDENCE?

{31} Defendants assert that the trial court should have granted their request for a mistrial in the second trial on grounds that the prosecutor's questions concerning the store's "total losses" was prejudicial to Defendants. At the second trial, in response to a question concerning the value of merchandise missing, Matlock testified that the total value was over $50,000. Defendants objected on grounds that the charges for which they were on trial concerned only $11,-063 of merchandise seized from Guilez and Salcido's residence. Defendants argued that this testimony, together with Allison's testimony that he had only given stolen merchandise to Defendants, allowed the jury improperly to have inferred that Defendants had received and disposed of over $38,000 of merchandise in other uncharged criminal acts. Defendants moved for a mistrial, which was denied.

{32} Defendants contend that the prosecutor's question introduced irrelevant evidence of other crimes or bad acts into Defendant's trial, in violation of Rule 11–404(B) NMRA 1999. Defendants assert that the trial court sustained the objections to this line of questioning in the first trial and gave the jury a limiting instruction. Despite this prior ruling, the prosecutor attempted to elicit the same testimony from Matlock at the second trial. Defendants claim testimony that there was additional non-recovered property missing from the store was prejudicial because it suggested they were involved in disposing of merchandise beyond that found in their residence, and beyond that charged at trial. Defendants further assert this testimony allowed the jury to infer that Defendants were involved with Allison in other instances of receiving or disposing of stolen J.C. Penney merchandise. We review the trial court's denial of a request for a mistrial for abuse of discretion. *See Foster*, 1998–NMCA–163, ¶ 24, 126 N.M. 177, 967 P.2d 852. "Discretion is abused when the decision is 'clearly against the logic and effect of the facts and circumstances before the court.'" *Id.* (citation omitted).

{33} Rule 11–404(B) provides:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

We agree with Defendants that the jury might infer from the testimony that Defendants had committed uncharged offenses of receiving stolen J.C. Penny merchandise. However, the prosecutor's question did not directly imply Defendants committed other uncharged crimes. *Cf. State v. Rowell*, 77 N.M. 124, 125–26, 419 P.2d 966, 968 (1966) (holding that prejudice resulted from the asking of the question itself, where prosecutor asked witness if she knew whether the Defendant was convicted in another state of same crime for which she was being tried).

{34} Moreover, the trial court excluded the testimony. *See* Rule 11–402 NMRA 1999 (relevancy); Rule 11–403 NMRA 1999 (prejudice). After Defendants' objection, the trial court instructed the jury that Defendants were not charged with any other crimes, and that the other losses testified to by Matlock were irrelevant to the issue of receiving stolen property before the jury. Therefore, "the probability of improper prejudice was not great, particularly in light of the district court's cautionary instruction." *Foster*, 1998–NMCA–163, ¶ 24, 126 N.M. 177, 967 P.2d 852. We conclude the trial court's limiting instruction was sufficient to cure any prejudice that may have resulted from the testimony. Moreover, "the district court acted well within the bounds of its discretion in determining that the evidence did not so taint the trial as to require a mistrial." *Id.* ¶ 24. Consequently, we hold that the trial court did not abuse its discretion in denying Defendants' request for a mistrial. *See Day*, 94 N.M. at 758, 617 P.2d

at 147 ("Use of the motion for a mistrial is not appropriately addressed to mere erroneous rulings of law, but generally is used to specify such fundamental error in a trial as to vitiate the result.").

### C. DID THE TRIAL COURT ERR IN EXCLUDING EVIDENCE OF ALLEGED FORGERIES BY ALLISON?

{35} Defendants argue that by disallowing certain testimony by Alvarez the trial court prevented them from cross-examining or otherwise impeaching Allison effectively. Specifically, defense counsel sought to elicit from Alvarez allegations that Allison had forged some of Alvarez's checks. They apparently then hoped to confront Allison with Alvarez's allegations during their cross-examination of Allison.

{36} Defense counsel tendered the substance of Alvarez's testimony: Alvarez would have testified that she discovered some checks she was missing had been forged by Allison, and that when she confronted Allison about the forged checks, he admitted it and offered to pay her back. Alvarez would also have testified that, to the best of her knowledge, Allison had used the money to buy cocaine. Alvarez stated she did not pursue the matter with the police because Allison was her boyfriend at the time.

{37} Defendants contend this information was relevant to Allison's credibility. Specifically, they argue it was relevant to impeach Allison's testimony that he only used the stolen merchandise to pay for cocaine, that the idea of exchanging stolen merchandise for cocaine was solely the Defendants', and that he stopped using cocaine before his arrest. Apparently, in Allison's earlier statement he claimed that he did not do illegal acts to pay for cocaine until Lucero suggested they exchange stolen merchandise for cocaine. Therefore, Defendants assert that Allison's forgery of checks to pay for cocaine, in a context not involving the Defendants, directly contradicts his testimony at trial. The trial court did not allow Defendants to pursue this line of questioning with Alvarez. We review the trial court's ruling for an abuse of discretion. *See State v.*

*Worley,* 100 N.M. 720, 723, 676 P.2d 247, 250 (1984).

{38} "The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation," but the evidence may "refer only to [the witness's] character for truthfulness or untruthfulness," and "is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise." Rule 11–608(A) NMRA 1999. Defendants argue that on this basis they should have been permitted to cross-examine Allison about the alleged forgeries. However, "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility, other than conviction of crime as provided in Rule 11–609 [NMRA 1999], may not be proved by extrinsic evidence." Rule 11–608(B). In construing Rule 11–608, our Supreme Court has indicated that impeachment of a witness should not suggest that the witness has been convicted of a misdemeanor or a felony when he has not been so convicted. *See State v. Robinson,* 99 N.M. 674, 676, 662 P.2d 1341, 1343 (1983). Here, no charges had been brought against Allison for the alleged forgeries, so Rule 11–609 was inapplicable.

{39} More importantly, the trial court did permit Defendants to ask Allison whether he had forged checks, despite having earlier granted the State's motion to exclude such cross-examination. But because Rule 11–608(B) forbids the use of extrinsic evidence (which Alvarez's proposed testimony surely was) to attack credibility, the matter was ended once Allison invoked his Fifth Amendment privilege. Moreover, Defendants' cross-examination of Allison revealed his agreement with the police and prosecutors, his gifts and sales of merchandise to third parties, his initial untruthfulness with the police, his use of drugs, and his debt for the purchase of drugs. We thus see no error in prohibiting Alvarez's testimony on the allegations of forgery under Rule 11–608.

{40} Defendants suggest that Alvarez's testimony should have been admitted based on the proposition that witnesses may be questioned about bias, which includes wheth-

er they have personally committed the crime with which the defendant is charged. Defendants rely on Rule 11–404(B) NMRA 1999, which provides:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

{41} In *Worley*, 100 N.M. at 723, 676 P.2d at 250, the Supreme Court held that it was not an abuse of discretion for the trial court to permit the State to cross-examine a defense witness about the witness's commission of the same crime with which the defendant was charged in order to show untruthfulness, bias, and prejudice. The rationale for permitting cross-examination in *Worley* was that it was relevant to determine the witness's motive or bias in testifying. *See id.* at 723, 676 P.2d at 250. That is, because the witness committed the same crime for which the defendant was charged, the State was permitted to show that the witness "attached minimal importance to the charge and would be willing to lie for the defendant." *Id.* We simply see no parallel to the present case.

■■■■■ {42} Finally, Alvarez's tendered testimony would not be permissible to contradict Allison's testimony, because the impeachment concerned a collateral issue. *See State v. Ross*, 88 N.M. 1, 4, 536 P.2d 265, 268 (Ct.App.1975).

The general test to determine whether or not an issue is collateral is whether the cross-examining party would be allowed to prove the matter in his case in chief. If this test is not met, the tender is immaterial and irrelevant to the case at bar, and generally ought not to be admitted for reasons of litigational fairness and judicial economy.

*Id.* at 3, 536 P.2d at 267 (citations omitted). Alvarez's testimony would have had nothing to do with Defendants' guilt or innocence, but might instead be viewed as an attempt to deflect attention from Defendants to Allison. As such, Alvarez's testimony would clearly have been collateral, and the trial court properly excluded it.

■■■■■ {43} Guilez and Salcido also argue that limiting their cross-examination denied them the right to confront the witnesses against them, as guaranteed by the state and federal constitutions. *See Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (holding that a criminal defendant is deprived of the right to confront witnesses if denied the opportunity to establish bias or unreliability of a witness). The State contends that Defendants did not preserve this issue for appeal by obtaining a ruling from the trial court on this ground. In order to preserve an issue for appeal, Defendant must make a timely objection that specifically apprises the trial court of the nature of the claimed error and invokes an intelligent ruling thereon. *See State v. Lucero*, 104 N.M. 587, 590, 725 P.2d 266, 269 (Ct.App.1986). Defendants fail to indicate how this issue was preserved for our review. *See* Rule 12–213(A)(4) NMRA 1999 (requiring that appellant's brief-in-chief set forth their arguments "with respect to each issue presented ... and a statement explaining how the issue was preserved in the court below, with citations to authorities and parts of the record proper, transcript of proceedings or exhibits relied on"). Therefore, we do not address the argument on appeal. *See State v. Olguin*, 118 N.M. 91, 99, 879 P.2d 92, 100 (Ct.App.1994) (refusing to address on appeal argument concerning the defendant's right to confront a witness where not specifically preserved at trial), *aff'd in part, set aside in part on other grounds*, 120 N.M. 740, 906 P.2d 731 (1995); *State v. Goss*, 111 N.M. 530, 533, 807 P.2d 228, 231 (Ct.App. 1991) ("Where defendants have failed to comply with Rules 12–208 and –213, or to indicate that the issue sought to be argued on appeal is jurisdictional, or that the issue was properly preserved for appellate review, an appellate court may decline to address such contention on appeal.").

## D. DID THE TRIAL COURT ERR IN COMMENTING ON DEFENDANT'S PROFFERED EVIDENCE?

■■■■■ {44} Initially, we note that Lucero does not argue this issue in his brief-in-chief

or reply brief, but relies on the arguments in the docketing statement. This is not an acceptable briefing practice and does not preserve any of the issues not specifically argued in the briefs. *See State v. Aragon,* 109 N.M. 632, 634, 788 P.2d 932, 934 (Ct.App. 1990). The State argues that Defendant Lucero abandoned this issue on appeal. We agree. Guilez and Salcido do specifically argue the issue in their briefs. We affirm the trial court.

{45} Defendants argue that the trial court erred in commenting on the tender of certain exhibits. Specifically, Defendants contend that when they tendered photographs showing the condition of the merchandise, the trial court stated that it was admitting the exhibits "for what they're worth." Defendants assert that this remark indicated the trial judge's belief that the photographs were worthless, either because they were not relevant to the issue, or because the issue was meritless. Defendants claim the comment was prejudicial because the case focused on the disputed issue of whether the merchandise was stored in boxes, as Defendants claimed, or was placed on display for retail sale in Defendants'. home, as the State asserted. Defendants contend that the photographs contradicted the State's witness's testimony concerning the condition of the merchandise. However, the State asserts that Defendants made no objection to the comment, and do not argue fundamental error on appeal. *See Lucero,* 104 N.M. at 590, 725 P.2d at 269 (stating that to preserve an issue for appeal, defendant must make a timely objection specifically apprising the trial court of the nature of the claimed error which invokes an intelligent ruling thereon). Defendants fail to indicate how this issue was preserved for our review. *See* Rule 12–213(A)(4) (requiring appellant to state how issue was preserved for appeal). Therefore, we need not address the argument on appeal. *See Goss,* 111 N.M. at 533, 807 P.2d at 231 ("Where defendants have failed to comply with Rules 12–208 and –213, or to indicate that the issue sought to be argued on appeal is jurisdictional, or that the issue was properly preserved for appellate review, an appellate court may decline to address such contention on appeal.").

## E. DID THE TRIAL COURT ERR IN ORDERING DEFENDANTS TO PAY RESTITUTION FOR THE FULL VALUE OF THE ITEMS?

{46} Defendants argue that the trial court incorrectly required them to pay restitution for the full retail value of the stolen merchandise. Defendants do not dispute that there exists a direct or causal relationship between the criminal activities for which they were convicted and the damages suffered by J.C. Penney. However, the parties disagree about how the value of the merchandise should be calculated.

{47} At the heart of the disagreement over restitution is J.C. Penney's decision to donate some of the recovered items to charity. J.C. Penney determined that some of the stolen items could be re-sold, but that some could not. The items the store thought could not be re-sold it donated to charity. The parties agreed that Defendants should only be responsible for restitution for the donated items, the retail value of which the parties agreed was $1,852.55. Defendants argued that they should only be liable for the wholesale value of the donated items, which the parties agreed totaled $873.38.

{48} Defendants argued to the trial court that the donated merchandise was not soiled or damaged and could have been resold. Defendants contend the trial court erred in ordering restitution for the lost profits due to J.C. Penney's decision to donate the merchandise to charity. Consequently, Defendants assert that the portion of Defendants' sentence which orders restitution for the retail value of the property is unauthorized by law, voidable, and should be severed from the judgment and sentence. *See State v. Pando,* 1996–NMCA–078, ¶ 14, 122 N.M. 167, 921 P.2d 1285 (stating that a portion of a sentence that is unauthorized by law is null and void and severable, if possible, from the legal and valid sentence).

{49} "It is the policy of this [S]tate that restitution be made by each violator of the Criminal Code to the victims of his criminal activities to the extent that the defendant is reasonably able to do so." NMSA 1978,

686

§ 31–17–1(A) (1993). As noted, the dispute in this case is over the measure of damages. Section 31–17–1(A)(2) defines "actual damages" as "all damages which a victim could recover against the defendant in a civil action arising out of the same facts or event." Defendants contend that since "actual damages" are the same as the damages a victim could recover in a civil action, the concepts of mitigation of damages and avoidable consequences should apply. *See Selgado v. Commercial Warehouse Co.*, 88 N.M. 579, 544 P.2d 719 (Ct.App.1975); *Rutledge v. Johnson*, 81 N.M. 217, 465 P.2d 274 (1970).

{50} In *State v. Ellis*, 120 N.M. 709, 712, 905 P.2d 747, 750 (Ct.App.1995), this Court applied a "hypothetical question implicitly contained in the statute's definition of actual damages." That question in this case is: What damages could J.C. Penney recover in a civil action against Defendant arising from the criminal charges relevant to this appeal? *See id.* Stated another way: Were the losses totaling $1,852.55 reasonably foreseeable by Defendants as resulting from the crimes for which they were found guilty? *See id.* We assume without deciding that under certain facts the civil concept of mitigation of damages might apply in the context of criminal restitution. If, for example, a defendant were to steal but otherwise not damage an automobile, we do not believe the victim could give away the undamaged automobile and expect to receive the full value as restitution. But again, we leave resolution of this issue for the appropriate case. We conclude that the trial court properly determined that the retail value of the merchandise was reasonably foreseeable by Defendants as resulting from the crime charged.

■ {51} In addition, the public policy behind the statute is to require criminals to make restitution to their victims. "[R]equiring victim restitution is declarative of public policy to make whole the victim of the crime to the extent possible." *State v. Lack*, 98 N.M. 500, 505, 650 P.2d 22, 27 (Ct.App.1982). Therefore, it was within the trial court's discretion to order restitution in an amount equal to the retail value of the merchandise in order to make J.C. Penney whole for the loss of the merchandise, regardless of the concept of mitigation of damages. *See id.* at 508, 650 P.2d at 30 (stating that trial is governed by its sound discretion in assessing restitution). Moreover, the trial court properly gave both the State and Defendants an opportunity to challenge the amount of restitution ordered. Consequently, we affirm the sentence ordering Defendants to pay restitution in the amount of $1,852.55.

## III. *CONCLUSION*

{52} For the foregoing reasons, we affirm the trial court's judgment and sentence.

{53} **IT IS SO ORDERED.**

HARTZ and BOSSON, JJ., concur.