1998-NMCA-075

960 P.2d 342

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**James HUFF, Defendant–Appellant.**

**No. 17615.**

Court of Appeals of New Mexico.

Feb. 20, 1998.

Certioraris Denied May 11, 1998
and May 13, 1998.

Tom Udall, Attorney General, Margaret McLean, Assistant Attorney General, Santa Fe, for Plaintiff–Appellee.

Anthony F. Avallone, Law Systems of Las Cruces, P.A., Las Cruces, for Defendant–Appellant.

## OPINION

FLORES, Judge.

{1} Defendant appeals his convictions on two counts of felony criminal sexual contact (CSC), contrary to NMSA 1978, § 30–9–12 (1993). On appeal, Defendant argues that his convictions should be reversed and the charges against him be dismissed because (1) the evidence of physical force is insufficient to sustain the convictions; (2) his convictions were obtained in a second trial that violated his right to be free from double jeopardy; and (3) he was not allowed to be present during certain ministerial stages of the jury impaneling process. Because we find these arguments to be without merit, we affirm his convictions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

{2} Defendant had been an acquaintance of Victim's family for approximately eleven or twelve years when he committed the two counts of CSC that are the subject of this appeal. Victim, a thirty-year-old woman at the time of the offenses, had the mental and intellectual capacity of a twelve-year-old. Prior to these offenses, Victim had been sexually abused by a family friend from the age of fourteen. It appears that this sexual abuse persisted over a considerable number of years. Victim never alleged that Defendant committed those prior acts of sexual abuse.

{3} On October 18, 1994, Defendant met Victim at her place of employment and invited her to go for a drive. Victim agreed and, after stopping at her home briefly to change into casual clothing, the two drove to Radium Springs. While driving back, Defendant reached across the front seat of his pick-up truck and grabbed and squeezed Victim's breasts underneath her clothing. In order to prevent Defendant from touching her, Victim moved as far away from Defendant as possible in the truck, hit him with her elbow, and told him to stop because he was hurting her. In addition to grabbing her breasts, Defendant rubbed Victim's clothed vaginal area. Again, Victim slapped Defendant's hand and told him to stop. Defendant was extremely persistent in grabbing Victim's breasts under her clothes and in rubbing her vaginal area, despite her requesting that he stop, her pushing his hand away, her crying, and her moving as close to the passenger door as possible in order to get out of his reach.

{4} When they returned from their trip, Victim did not ask Defendant into her home. However, Defendant followed Victim into the house and into her bedroom. Standing behind her in the bedroom, Defendant grabbed Victim's breasts under her clothing, squeezing them so hard that she was unable to breathe. Victim tried to get out of Defendant's grip, but was unable to do so because Defendant was holding her so tightly. Victim was so scared that her entire body shook and she had difficulty breathing. Victim told

Defendant that she was unable to breathe and, eventually, Defendant released her because she was feeling dizzy.

{5} Because of her dizziness, Victim sat on her bed. Defendant also sat on the bed. Defendant then proceeded to touch Victim in what she described as her "private spots." Under the guise of rubbing her stomach, where her ulcer was causing her pain, Defendant unzipped Victim's pants and began rubbing Victim's unclothed vagina. Victim told Defendant that the area he was touching was not the area that hurt. Victim asked Defendant to stop touching her there because "it was not right." In addition to asking him to stop touching her, Victim tried to move Defendant's hand away a number of times, but each time Defendant replaced his hand on her unclothed vagina. Victim got off her bed and left the room, crying and shaking. Victim testified that she did not want Defendant to touch her.

{6} For four months following these incidents, Victim experienced nightmares and cried out in her sleep. Victim was depressed, did not want to go to work, and was fearful that these offenses would recur.

{7} Defendant was charged with two counts of criminal sexual contact resulting in personal injury, a fourth degree felony. Prior to the first trial, the prosecutor, defense counsel, and Dr. Flores, the psychiatrist who would testify for the State, met to discuss the psychiatrist's testimony. At that time, Dr. Flores clarified that he diagnosed Victim with posttraumatic stress disorder (PTSD) based on a history of sexual abuse of Victim that began when she was fourteen. Dr. Flores also made clear that his diagnosis was not based on the events of October 18, 1994. Indeed, Victim had never even told Dr. Flores about the most recent events involving Defendant. Despite this knowledge regarding the basis of Dr. Flores' diagnosis, the prosecutor, at the first trial, asked Dr. Flores about Victim's PTSD without revealing Victim's unrelated history of sexual abuse. Defendant's first trial resulted in a mistrial because of the State's introduction of prejudicial expert testimony concerning diagnosis of Victim with PTSD.

{8} After the first trial, Defendant moved to quash the second jury array and to dismiss the charges based on prosecutorial misconduct. The court denied the motion. Also, Defendant was not permitted to attend certain ministerial portions of the impaneling of the jury in the second trial. At the second trial, Defendant was convicted on both counts of CSC without the prejudicial expert testimony. Defendant appealed.

## II. *DISCUSSION*

### *Sufficiency of the Evidence of Force*

■ {9} Criminal Sexual Contact "is the unlawful and intentional touching of or application of force, without consent, to the unclothed intimate parts of another who has reached his eighteenth birthday." Section 30–9–12(A). Criminal Sexual Contact becomes a fourth degree felony when it is perpetrated "by the use of force or coercion that results in personal injury to the victim." Section 30–9–12(C)(1). Force is defined by statute as "the use of physical force or physical violence." NMSA 1978, § 30–9–10(A)(1) (1993). Defendant contends that in this case the evidence of force is insufficient to sustain his convictions for felony CSC. Defendant does not challenge the sufficiency of the evidence for any other element of CSC. In essence, Defendant argues that physical force is required to prove felony CSC, and that Victim's testimony alone demonstrates that Defendant did not use physical force.

■ {10} We review sufficiency of the evidence claims "to determine whether *any* rational jury could have found each element of the crime to be established beyond a reasonable doubt." *State v. Garcia*, 114 N.M. 269, 274, 837 P.2d 862, 867 (1992). In addition, we review the evidence in the light most favorable to the verdict, "resolving all conflicts therein and indulging all permissible inferences therefrom in favor of the verdict." *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988).

{11} Applying this standard of review, we believe the jury could reasonably determine that Defendant used force. Further, based on Victim's testimony, a rational jury could have found that the State proved the

force element of felony CSC beyond a reasonable doubt. In this regard, the use of physical force is clear under both counts: Defendant grabbed Victim's breasts and squeezed them. Both in the car and in the bedroom, Defendant's forceful grabbing of Victim's breasts caused her pain and discomfort. In the bedroom, Defendant squeezed Victim's breasts so tightly that she was unable to breathe, became dizzy, and was unable to extricate herself from his grip. Although Defendant offered conflicting testimony, the jury is entitled to disregard Defendant's version of the facts. *See State v. Vigil,* 87 N.M. 345, 350, 533 P.2d 578, 583 (1975).

{12} We also note that the elements of CSC describe the quality of *Defendant's* actions, but do not require a particular quantum of force. *See* § 30–9–12. Moreover, neither the statute nor the Uniform Jury Instruction for CSC, *see* UJI 14–902 NMRA 1998, requires proof of *Victim's* action or inaction in the face of Defendant's conduct. "The issue is not how much force or violence is used, but whether the force or violence was sufficient to negate consent. Physical or verbal resistance of the victim is not an essential element" of CSC. Committee commentary, UJI 14–902.

*Double Jeopardy*

■ {13} Defendant argues that he has been subjected to double jeopardy in violation of the federal and state constitutions. *See* U.S. Const. amend. V; N.M. Const. art. II, § 15. According to Defendant, his convictions cannot stand because he should not have been subjected to a second trial, even though he requested the mistrial. As a general rule, reprosecution is constitutionally permissible when a defendant obtains a mistrial upon his or her own motion. *See State v. Breit,* 1996–NMSC–067, ¶ 14, 122 N.M. 655, 930 P.2d 792. "However, when a defendant's mistrial motion . . . is necessitated by prosecutorial misconduct, reprosecution may be barred." *Id.* Here, Defendant moved for and was granted a mistrial because of the introduction of unduly prejudicial expert testimony. The question on appeal is whether introduction of such prejudicial testimony constituted prosecutorial misconduct, so that Defendant should not have been subjected to a second trial on the same charges.

■ {14} Our Supreme Court established a three-part test for determining whether retrial is barred when a defendant moves for a mistrial due to prosecutorial misconduct. *See id.* ¶ 32. Under *Breit,* retrial is barred when (1) improper prosecutorial conduct is so unfairly prejudicial to the defendant that it cannot be cured by any means short of a mistrial; (2) the prosecutor knows or can be presumed to know that the conduct is improper and prejudicial; and (3) the prosecutor either (a) intends to provoke a mistrial, or (b) acts in willful disregard of the resulting mistrial, retrial, or reversal. *See id.* ¶¶ 32–33. In applying this test, we consider "the prosecutor's conduct in light of the totality of the circumstances of the trial," *id.* ¶ 40, considering the findings of the trial court as well as evidence included in the record. *See id.* ¶ 37.

{15} The conduct challenged in this case is limited to the prosecutor's questioning of Dr. Flores regarding whether Victim exhibited the symptoms of PTSD, and whether those symptoms were consistent with someone who has been the victim of sexual abuse. As noted above, both the prosecutor and defense counsel knew that Dr. Flores' PTSD diagnosis was based on a long history of sexual abuse and was not based on Defendant's recent alleged conduct. According to the prosecutor, her questions were permissible under the holding and rationale of *State v. Alberico,* 116 N.M. 156, 861 P.2d 192 (1993).

{16} Although the first prong of the *Breit* test is dispositive in this case, we begin our analysis with prongs two and three, in order to alert prosecutors to their obligations and limits under *Breit.*

*Presumption of Knowledge of Impropriety*

■ {17} This prong of the *Breit* test requires us to consider whether the prosecutor knew or can be presumed to have known that the conduct was improper and prejudicial. *Breit,* 1996–NMSC–067, ¶¶ 32–33, 122 N.M. 655, 930 P.2d 792. Here, the trial court

found no misconduct because the prosecutor did not know that her questions were improper based on her interpretation of *Alberico*. Under the *Breit* test, however, reprosecution may be barred even if the prosecutor did not know the conduct was improper and prejudicial. In certain cases, the court may presume the prosecutor knew the conduct was improper. *See Breit*, 1996–NMSC–067, ¶ 33, 122 N.M. 655, 930 P.2d 792. Our Supreme Court emphasized that "[r]are are the instances of misconduct that are not violations of rules that every legal professional, no matter how inexperienced, is charged with knowing." *Id.*, (citing *Pool v. Superior Court*, 139 Ariz. 98, 677 P.2d 261, 270 (1984) ("The law cannot reward ignorance; there must be a point at which lawyers are conclusively presumed to know what is proper and what is not.") (en banc)). Thus, this Court must determine whether the prosecutor can be presumed to know that her questioning of Dr. Flores about PTSD resulting from sexual abuse with which Defendant was not charged, was irrelevant, misleading, and prejudicial, given the *Alberico* case and Rules 11–402 and 11–403 NMRA 1998.

{18}  A prosecutor should know the rules of evidence. At the very least, a prosecutor should know a fundamental rule of evidence: for evidence to be admissible it must be relevant. *See* Rule 11–402. That is, the evidence must tend to prove or disprove a fact of consequence. *See* Rule 11–401 NMRA 1998. Although evidence of PTSD can tend to show that a crime (sexual abuse) has been committed, *see Alberico*, 116 N.M. at 177, 861 P.2d at 213, and thus can be relevant, it may not always be relevant. In *Alberico*, the testimony indicated that the victim had been raped once, by the man actually accused of the rape. *Id.* at 159, 861 P.2d at 195. In that case, although the court did not allow the expert witness to testify that there was a causal link between the rape and the PTSD, there were no other facts in evidence that could have caused the PTSD. *See id.* at 159–60, 861 P.2d at 195–96. Our Supreme Court held the PTSD testimony to be relevant because the testimony tended to show that rape occurred. *See id.* at 175, 861 P.2d at 211.

{19}  Here, however, the PTSD was not relevant. Victim was sexually abused for nearly sixteen years. Defendant was charged with only two counts of CSC, both of which occurred on October 18, 1994. Further, Dr. Flores made the PTSD diagnosis without any knowledge of the October 18 events. Thus, Victim's PTSD in this case could be the result of years of sexual abuse, not the result of the recent sexual contacts by Defendant. Because this PTSD testimony would tend to prove facts that are not material to this prosecution, this PTSD evidence is not relevant. Apparently the prosecutor did not take these factual differences into consideration when she relied on *Alberico* as a basis for introducing PTSD testimony in this case. Had the prosecutor considered these important factual differences, she should have known that the PTSD testimony was not relevant.

{20}  A prosecutor should also know that even relevant evidence can be excluded if its probative value is substantially outweighed by the dangers of unfair prejudice or misleading the jury. *See* Rule 11–403. Dr. Flores' testimony, in addition to being irrelevant, was also misleading and extremely prejudicial. For the reasons noted above, Dr. Flores' PTSD testimony would have allowed the jury to make an unreasonable inference: that the acts with which this Defendant was charged caused the PTSD. This inference is particularly unreasonable, and the testimony particularly misleading, because Dr. Flores' diagnosis was based only on Victim's history of sexual abuse, and not on the events with which the Defendant was charged. In fact, Victim did not even tell Dr. Flores about those recent events when she sought treatment. The prosecutor learned all of this prior to trial in a meeting with defense counsel and Dr. Flores. Yet, the prosecutor chose to pursue this irrelevant, misleading, and prejudicial testimony.

{21}  Although the prosecutor was correct that *Alberico* precludes her from asking about the actual causes of PTSD, *see Alberico*, 116 N.M. at 176, 861 P.2d at 212, and that it allows her to ask if the complainant's symptoms are consistent with someone who has suffered sexual abuse, *see id.* at 178,

861 P.2d at 213–14, the *Alberico* case did not overturn the basic rules of evidence to allow the introduction of irrelevant, misleading, and prejudicial testimony simply because it is PTSD testimony. This is not a subtle point of law, and one we can presume any prosecuting attorney to know. Because we can presume that the prosecutor knew that her conduct was improper and prejudicial under the rules of evidence, we hold that the second prong of the *Breit* test is satisfied.

### Willful Disregard

{22}  In order for double jeopardy to bar retrial, the prosecutor must act in willful disregard of the resulting mistrial. *See Breit*, 1996–NMSC–067, ¶ 32, 122 N.M. 655, 930 P.2d 792. Our Supreme Court explained that "willful disregard" means either that the prosecutor actually was aware or that we can presume that she was aware of the potential consequences of her actions. *See id.* ¶ 34. Thus, the crucial question here is whether the prosecutor was aware of the potential consequences of her conduct when: (1) she questioned Dr. Flores regarding his diagnosis, while knowing that his diagnosis was based on information concerning sexual abuse probably not involving Defendant; (2) she knew that Dr. Flores' diagnosis was based on incomplete information that did not include the incidents for which Defendant was charged; and (3) bench conferences and sustained objections repeatedly raised the issue of prejudice.

{23}  Given the prosecutor's persistent line of questioning, the consistently sustained objections, and the repeated warnings from the bench to limit her questions to the most recent incidents of sexual contact involving Defendant, the prosecutor must have been aware of the potential for mistrial. First, after a bench conference early in Dr. Flores' testimony, the prosecutor asked: "In your opinion, are her symptoms, . . . that you observed, consistent with those of someone who has been sexually abused?" Defense counsel objected and the objection was sustained, with this direction from the judge: "Let's limit it to this specific occasion ." The prosecutor then repeated to the judge that her line of questioning was based on *Alberi-*

co.  The judge then called another bench conference and told the prosecutor: "I'm disturbed that [Dr. Flores is] saying this has been going on since age fourteen. That's not relevant if someone else was doing it. It's not relevant. This man's not charged with that. He's got to limit his opinion testimony to what happened as a result of this specific one occasion." After this bench conference, the prosecutor asked: "Based on the recent incident that [Victim] related to your office involving her, in your opinion, are her symptoms, that you observed, consistent with someone who's been sexually abused?" Again, this question raised and sustained an objection. When the prosecutor next asked if the Victim told Dr. Flores of a recent incident that had occurred, Dr. Flores answered: "No, she did not." Dr. Flores further testified that he did not inquire into any particular or recent events. Moments later, the prosecutor asked Dr. Flores if he had recommended therapy "as a result of diagnosing the depression and the PTSD." The witness answered, "That's correct."

{24}  Although the prosecutor did attempt to adjust her line of questioning to some extent to accommodate the court's concerns, she nevertheless proceeded with a line of questioning that was likely to lead to a mistrial. Because of the ongoing objections, bench conferences, and warnings by the court, we presume that the prosecutor was aware of the potential mistrial. Although the prosecutor may not have intended to introduce inadmissible evidence, the *Breit* test is not simply an intent-based test and double jeopardy can bar retrial based on prosecutorial misconduct not intended to provoke a mistrial. *See Breit*, 1996–NMSC–067, ¶¶ 34, 36, 122 N.M. 655, 930 P.2d 792. We hold that the third prong of the *Breit* test is satisfied.

### Mistrial—Not Only Cure

{25}  The first prong of the test requires us to determine whether the prosecutor's improper conduct was so unfairly prejudicial to Defendant that the prejudice could not be cured by any means short of a mistrial. *See id.* ¶ 32. Although we hold that the prosecutor's conduct and knowledge

would satisfy the other two prongs of the *Breit* test, we hold that a mistrial may not have been necessary in this case. Defense counsel could have pursued various actions to prevent the admission of the prejudicial testimony, or to mitigate the damage done by such testimony once admitted. For example, because defense counsel knew about the faulty basis of Dr. Flores' diagnosis prior to trial, defense counsel could have filed a motion in limine in order to preclude the prejudicial testimony, which he did not do. Failing that, defense counsel could have cross-examined Dr. Flores or offered his own expert in order to cast doubt on Dr. Flores' testimony. Again, defense counsel failed to act, choosing neither to cross-examine the prosecution's witness nor to introduce his own expert. Finally, although Defense counsel requested that the court strike Dr. Flores' testimony, the court never made a ruling. We view this failure to further pursue a ruling as an abandonment of the request. Moreover, Defense counsel could have requested a cautionary instruction. Once again, Defense counsel made no such request. Given the variety of preventative measures that defense counsel could have taken, we cannot conclude that a mistrial was the only possible method of remedying the damage done by Dr. Flores' misleading and prejudicial testimony.

{26}  We recognize that defense counsel was put in an awkward position by the trial court. While at trial, during a bench conference, the court commented to counsel that it did not believe an instruction to the jury to disregard Dr. Flores' testimony would cure the prejudice to Defendant, and asked Defense counsel if he was seeking a mistrial. Defense counsel, relying on the court's comment, answered in the affirmative. Later, at the hearing to quash the second trial, the court made the following finding: "That the Court could have admonished the jury to disregard certain testimony, but that the Defendant preferred a mistrial." Although we feel some empathy for defense counsel on this point, defense counsel had other options, enumerated above, that he failed to pursue in order to prevent a mistrial. For these reasons, we hold that the first prong of the *Breit* test is not satisfied and, therefore, that De-

fendant's second trial did not violate his right to be free from double jeopardy.

{27}  Notwithstanding our holding on this issue, we think it is important to emphasize that we do not condone the behavior of the prosecutor in this case.

*Jury Impaneling*

■  {28}  Defendant relies on *State v. Garcia*, 95 N.M. 246, 249, 620 P.2d 1271, 1274 (1980) (defendant has right to be present when challenges to jurors are made), to argue that he had a right to be present at all stages of the jury impaneling process, including during the court clerk's compiling of random jury panels. We disagree with Defendant's position.

{29}  The issue Defendant raises here differs significantly from the issue decided in *Garcia*. Our Supreme Court in *Garcia* essentially determined that the defendant had a right to be present during the questioning of potential jurors because the defendant might be able to detect bias or prejudice in the subtle mannerisms of potential jurors that counsel might not recognize. *See id.* In this respect, the defendant's presence could affect the composition of the jury by aiding counsel in the use of juror challenges. Here, however, Defendant can provide no meaningful insight or aid to defense counsel by being present when the court clerk runs a computer program to randomly select jury panels. This task is mechanized and involves no discretion or judgment with which Defendant could assist.

■  {30}  Defendant's reliance on Rule 5–612 NMRA 1998 is similarly misplaced. Rule 5–612 defines those stages of the judicial process when Defendant's presence is required. Under this rule, "defendant shall be present ... at every stage of the trial including the impanelling of the jury." Rule 5–612(A). The rule, however, does not require, nor expressly or impliedly permit, a defendant's presence at the computerized selection of the jury panel from which the jury will eventually be selected. Because this stage is purely ministerial, there is no reason for a defendant to be present. Thus, we hold that Defendant's rights were not violated

because he was not present to observe the computerized selection of the jury panel.

{31} Defendant also argues that he should have been present when the clerk of the court culled disqualified or exempted members from the jury pool prior to voir dire examination. Here again, Defendant's presence would not impact the process. Defendant has no statutory authority to participate in this process, and, unlike the process of challenging potential jurors where Defendant may be able to discern some bias or prejudice, defendant can provide no special insight into the removal of jurors from the pool who are disqualified or excused on statutory grounds. *See* NMSA 1978, § 38–5–1 (1991).

{32} Finally, we note that Defendant made no argument, and produced no evidence, that he was prejudiced in any way by the jury in his trial, or that his jury panel was unfair. *See State v. Duran,* 107 N.M. 603, 608–09, 762 P.2d 890, 895–96 (1988) ("[T]o establish a due process violation, and thus reversible error, the defendant must demonstrate prejudice."); *see also State v. Hoxsie,* 101 N.M. 7, 10, 677 P.2d 620, 623 (1984) (absent prejudice, no reversible error), *overruled on other grounds by Gallegos v. Citizens Ins. Agency,* 108 N.M. 722, 731, 779 P.2d 99, 108 (1989). Thus, even if we concluded, which we do not, that Defendant had a right to be present during the computerized selection of a jury pool, Defendant's claim would still fail for lack of prejudice.

### III. *CONCLUSION*

{33} For the foregoing reasons, Defendant's convictions on two counts of felony criminal sexual contact are affirmed.

{34} **IT IS SO ORDERED.**

WECHSLER and BUSTAMANTE, JJ., concur.