2008-NMCA-133

193 P.3d 578

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Reyes MARQUEZ, Defendant–Appellant.**

**No. 27,735.**

Court of Appeals of New Mexico.

July 28, 2008.

Certiorari Granted, No. 31,294,
Sept. 22, 2008.

Gary K. King, Attorney General, Andrew S. Montgomery, Assistant Attorney General, Santa Fe, NM, for Appellee.

John Bigelow, Chief Public Defender, Adrianne R. Turner, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

PICKARD, Judge.

{1} Defendant appeals his conviction for driving while intoxicated (DWI). He contends that the trial court erred when it determined that Defendant's appearance for trial dressed in his military uniform was an exceptional circumstance that allowed the court to extend the time that the State had to bring Defendant to trial. He also challenges the sufficiency of the evidence supporting his conviction. Finally, he contends that the court admitted testimony regarding the significance of the horizontal gaze nystagmus (HGN) test as it relates to blood alcohol content (BAC) without the proper foundation. We affirm.

## BACKGROUND

{2} Officer Benjamin Kirby (Kirby) was on duty at the door to a night club in Albuquerque, New Mexico, when he saw Defendant leaving. Defendant appeared to be staggering. Kirby cautioned Defendant not to drive, but Defendant ignored the officer's advice and got into a red pickup truck in the parking lot outside the bar. Kirby then saw Defendant's red pickup back out of its parking spot at the same time that a white truck pulled into the lot. The white truck accelerated as if trying to avoid a collision, while the

red truck "stabbed" its brakes and then continued in reverse approximately sixty feet into traffic on Montgomery Boulevard. Kirby radioed a police dispatcher to report what he had seen.

{3} Officer Kelly Enyart (Enyart) responded to Kirby's request for an officer to stop the red truck. Enyart saw Defendant backing out onto the boulevard in front of her. Enyart activated her emergency lights, but Defendant did not immediately stop. Instead, he lurched forward and accelerated back into the parking lot. When she pulled Defendant over, Enyart smelled alcohol, observed Defendant's bloodshot, watery eyes, and noticed that his speech was slurred. When Enyart asked for Defendant's driver's license, registration, and proof of insurance, Defendant had trouble complying because he had "fumbling fingers." Defendant acknowledged having consumed two alcoholic drinks. When getting out of the truck, he was slow to respond and had his hand on the side of the vehicle for balance.

{4} Enyart asked Defendant to perform field sobriety tests (FSTs). Defendant asked Enyart if he could perform the tests in a place other than the parking lot, and she allowed him to do so. Enyart ensured that Defendant's preferred location was level and well lit, that the asphalt surface was free of debris, and that it was not wet or slippery. Enyart asked Defendant whether he had any problems walking or balancing and whether he had any problems that might prevent him from performing tests requiring walking or balancing, and he said he did not.

{5} Defendant had a hard time understanding Enyart's instructions, and Enyart had to explain and demonstrate the tests several times. During the HGN test, Defendant was unable to follow the officer's instructions and swayed noticeably backward and forward. During the walk and turn test, Defendant had to be instructed three times, and Enyart observed five of the eight clues. Defendant blamed his walking and balancing problems on having been in Iraq, but he could not say that he had been injured or exposed to anything that would cause such problems. Defendant was also unsuccessful in performing the one leg stand test, failing on three of four clues. Enyart then arrested Defendant for DWI. Defendant became upset and uncooperative and began using profanity. He initially agreed to take a breath alcohol test, but then refused. He was advised of the legal consequences of refusing to take the test, but he refused two more times.

{6} Defendant was charged with aggravated driving under the influence of intoxicating liquor, contrary to NMSA 1978, § 66–8–102 (2005) (amended 2007). He was arraigned on July 20, 2005. Following several delays, the case was set for trial on January 13, 2006. Both parties announced that they were ready for trial, and a jury panel was standing by. The judge then made the observation on the record that Defendant was wearing a camouflage military uniform in the courtroom. The State objected on the ground that Defendant's being in uniform was prejudicial. Defense counsel said that he told Defendant not to wear his uniform to court, but that Defendant was a member of the New Mexico National Guard and that his supervisor had instructed him to wear it.

{7} The court instructed Defendant not to wear the uniform at trial. However, Defendant did not have any other clothes with him, and he told the court, in a manner suggesting that he would not be able to be back on time, that he would have to return to his home in order to change. Defendant asked how much time the court would allow him to get a change of clothes. The court remarked that it was a Friday, a jury needed to be picked, and it would not allow for the delay required for Defendant to get new clothes and return for trial the same day. Taking into consideration the court's busy docket, that it was already after 10:00 a.m., and the time it would take for Defendant to get new clothes, the court believed that there was inadequate time to get the case to a jury the same day. The court ordered the case reset, held that the delay was due to Defendant's attire, deemed the situation an "exceptional circumstance," and ordered a 30–day extension of the 182–day rule. The court ordered Defendant to wear civilian clothing to the next trial setting.

{8} Trial was held on February 14, 2006. During her testimony, Enyart stated that the

National Highway Traffic Safety Administration (NHTSA) conducted studies that established a correlation between the clues on FSTs and a person's blood or breath alcohol concentration. She testified that, according to the NHTSA, if two or more clues are observed during the walk and turn test, there is a 68% likelihood that the person's alcohol level is at or above New Mexico's legal limit of 0.08 percent. Moreover, if two or more clues are observed on the one leg stand test, there is a 65% chance that the person's alcohol concentration meets or exceeds 0.08 percent. The State then asked: "What if you put all three of the tests together?" Over Defendant's objection, Enyart testified that based on the clues of all three field sobriety tests, including the HGN test, the probability that a person's breath score was over the legal limit was in the ninetieth percentile. Defendant was convicted of DWI, and the district court affirmed his conviction in a lengthy memorandum opinion. We also affirm.

## DISCUSSION

### The 182–Day Rule

{9} In metropolitan court, the 182–day rule provides that "[t]he trial of a criminal citation or complaint shall be commenced within one hundred eighty-two (182) days after whichever of the following events occurs latest: (1) the date of arraignment or the filing of a waiver of arraignment of the defendant." Rule 7–506(B) NMRA. "The purpose of the 182–day rule . . . is to encourage the prompt and orderly disposition of criminal cases, not to effectuate dismissals." *State v. Maestas*, 2007–NMCA–155, ¶ 8, 143 N.M. 104, 173 P.3d 26 (internal quotation marks and citation omitted). Accordingly, the rule includes a mechanism that allows the court to extend the time for commencing trial "upon a determination . . . that exceptional circumstances exist that were beyond the control of the state or the court that prevented the case from being heard within the time period, provided that the aggregate of all extensions granted pursuant to this subparagraph may not exceed thirty (30) days." Rule 7–506(C)(5). The committee commentary accompanying the rule explains: " 'Exceptional circumstances', as used in this rule,

would include conditions which are unusual or extraordinary such as: death or illness of the judge, prosecutor, or a defense attorney immediately preceding the commencement of the trial; and circumstances which ordinary experience or prudence would not foresee, anticipate or provide for." Rule 7–506 committee commentary.

{10} Defendant argues that the metropolitan court erred in finding on January 13, 2006, that exceptional circumstances required an extension of trial until February 14, 2006. Application of Rule 7–506 to the facts of this case is a question of law that we review de novo. *Maestas*, 2007–NMCA–155, ¶ 9, 143 N.M. 104, 173 P.3d 26. However, the underlying facts, such as which party was responsible for the delay, were for the metropolitan court to decide in the first instance, and we review those findings for substantial evidence. *See id.*; *State v. Hand*, 2008–NMSC–014, ¶ 6, 143 N.M. 530, 178 P.3d 165 (explaining that where appellate court reviews application of law to facts, trial court's factual findings are reviewed for substantial evidence, and appellate court indulges all reasonable inferences in support of the trial court's decision). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Salgado*, 1999–NMSC–008, ¶ 25, 126 N.M. 691, 974 P.2d 661 (internal quotation marks and citations omitted).

{11} Defendant contends that appearing for trial in a camouflage military uniform against his own counsel's instructions was not exceptional, but was only a "routine" choice of attire. He argues that any prejudice caused by his clothing choice could have been accommodated through voir dire and curative instructions to the jury. We disagree. We share the metropolitan court's concerns that Defendant's appearance in front of the jury in a military uniform "tends to pull on the heart strings of some members of the jury," and that "just the sight of somebody in a camouflage uniform in today's climate[ ] leads to something else [in the minds of the jurors, and may prevent the jury from] just simply hearing a case on its facts[ ] and coming to a jury decision on the merits." Trial courts are vested with "broad discre-

tionary powers in supervising the selection of jurors," and these powers include the power to limit the extent of examination of potential jurors. *State v. Fransua,* 85 N.M. 173, 176, 510 P.2d 106, 109 (Ct.App.1973). We hold that the court in this case acted within its discretion in determining that Defendant's appearance in uniform could unfairly prejudice the jury and that voir dire and instructions to the jury would be less effective methods of eliminating this prejudice than ordering Defendant to appear in civilian clothes. Defendant's reliance on cases in which appellate courts held that it was not reversible error for trial courts to handle the matter of potentially prejudicial clothing by voir dire, being in the opposite procedural posture, are not persuasive.

{12} We emphasize that our holding that the circumstances facing the metropolitan court on January 13, 2006, were exceptional under Rule 7–506 turns on the unique facts of this case. Substantial evidence supports the metropolitan court's finding that Defendant was responsible for the delay. Defendant's counsel agreed that his client's attire created a danger of unfair jury prejudice, and he informed the court that he had instructed Defendant not to wear his uniform. Despite his attorney's instructions, Defendant appeared in his uniform and without a change of clothes. When the court told Defendant that he could go get a change of clothes, defense counsel responded that Defendant lives in Bernalillo, a town north of Albuquerque, and after further discussion, defense counsel told the court that he didn't know how long it was going to take for Defendant to get new clothing. At this point, the court ordered the case reset to allow Defendant to be in proper clothing. However, because it was already ten o'clock in the morning on Friday, January 13, a jury had to be chosen, and the court's docket was too busy to accommodate resetting the trial by Wednesday, January 18, the last day of the 182–day period, the court ordered a 30–day extension.

{13} The 182–day rule, like the six-month rule in district court, is "to be applied with common sense and not used to effect technical dismissals." *State v. Collins,* 2007–

NMCA–106, ¶ 26, 142 N.M. 419, 166 P.3d 480 (internal quotation marks and citation omitted); *see* Rule 5–604 NMRA. We cannot say that the trial court's application of Rule 7–506 was improper, given the circumstances created by Defendant's decision to appear in his military uniform, his failure to bring a change of clothes despite having been told not to wear his uniform by his counsel, his counsel's assertions to the court that he did not know how long it would take Defendant to get a change of clothes from home and suggesting that he would not be able to do so prior to the scheduled commencement of trial that day, the court's busy docket, and the fact that Defendant's trial was scheduled to take place shortly before the expiration of the initial 182–day period. Such circumstances "were beyond the control of the state or the court" and "prevented the case from being heard within the time period." Rule 7–506(C)(5). Moreover, these were "circumstances which ordinary experience or prudence would not foresee, anticipate or provide for," and we hold that the court's extension of the 182–day rule was not in error. *See* Rule 7–506 committee commentary.

{14} Defendant contends that there was no exceptional circumstance because the trial court could have waited for him to return home to change his clothes and started the trial within the initial 182 days. In making this argument, however, Defendant would require that our metropolitan courts set their dockets in a manner that allows greater flexibility than was reasonable to expect under the circumstances of this case. The trial judge noted that holding the trial after Defendant returned with a change of clothes was "incompatible" with the court's docket later the same day. It is critical to our analysis that when Defendant's trial did not take place on January 13, there were only two business days remaining prior to the expiration of the 182–day period because the other days were weekends or holidays, and Defendant was largely responsible for the delays that led to this circumstance. His trial was initially set for September 2005. When the case was first called in September, Defendant had not completed witness interviews, so trial was reset for November 2005. In November, Defendant requested a second

continuance because he had not completed witness interviews and discovery, and the court reset the trial for December 2005. In December, neither party was prepared because Enyart was in training and Defendant had to complete a witness interview, so the court granted a continuance and reset the trial for January 13, 2006. That Defendant's delays significantly contributed to the delays that preceded his creating the extraordinary circumstances before the court on January 13 further supports our holding that the court's decision to extend the 182–day period was not erroneous.

### Substantial Evidence

■ {15} Defendant contends that there was insufficient evidence to convict him of DWI. "The sufficiency of the evidence is reviewed pursuant to a substantial evidence standard." *State v. Treadway*, 2006–NMSC–008, ¶ 7, 139 N.M. 167, 130 P.3d 746. In deciding whether there is substantial evidence to support a conviction, we view the evidence in the light most favorable to the State, resolving all conflicts and indulging all permissible inferences in favor of the verdict, and then determine whether there is either direct or circumstantial evidence that a reasonable mind might accept as adequate to support a verdict of guilt beyond a reasonable doubt with respect to each essential element of the offense. *State v. Neal*, 2008–NMCA–008, ¶¶ 19–20, 143 N.M. 341, 176 P.3d 330. We do not reweigh the evidence or substitute our judgment for that of the fact finder, and we disregard conflicting evidence that would support a contrary verdict. *Id.*

{16} In this case, the issue in contention was whether the State proved beyond a reasonable doubt that, "as a result of drinking liquor, [Defendant] was less able to the slightest degree, either mentally or physically, or both, to exercise the clear judgment and steady hand necessary to handle a vehicle with safety to the person and the public." UJI 14–4501 NMRA. The evidence supporting such a finding is as follows. Defendant was seen staggering out of a bar, apparently intoxicated. He was cautioned by Kirby not to drive, but he appeared to ignore the officer's advice and got into his truck. He im-

mediately began driving erratically, narrowly missed a collision with another vehicle in the parking lot, and then backed into oncoming traffic on Montgomery Boulevard. He did not immediately yield when Enyart signaled for him to stop, but lurched forward and into the parking lot.

{17} Moreover, Defendant exhibited many signs that he was under the influence of alcohol. He had fumbling fingers, smelled of alcohol, had bloodshot, watery eyes, and slurred his speech. He admitted that he consumed two alcoholic drinks. When asked to step out of his vehicle, he was slow to respond and braced himself on his vehicle for balance. After being instructed repeatedly on how to perform FSTs, he failed on numerous clues. Finally, he repeatedly refused to take a breath alcohol test, supporting an inference of consciousness of guilt. *See State v. Soto*, 2007–NMCA–077, ¶ 34, 142 N.M. 32, 162 P.3d 187 ("A jury may infer Defendant's consciousness of guilt and fear of the test results from Defendant's refusal to take a breath test.").

{18} We hold that a reasonable mind could accept the foregoing evidence as adequate to support a finding beyond a reasonable doubt that Defendant was impaired by alcohol "to the slightest degree." *Neal*, 2008–NMCA–008, ¶¶ 26, 29, 143 N.M. 341, 176 P.3d 330 (holding that evidence was sufficient to support a reasonable inference that the defendant was under the influence of alcohol where he was seen veering over the shoulder line of the road; he smelled of alcohol and had bloodshot, watery eyes; he admitted to drinking; he failed on several FST criteria; he appeared to the officer to be under the influence of alcohol; and he stated that he did not want a DWI on his record, supporting an inference of consciousness of guilt); *State v. Sanchez*, 2001–NMCA–109, ¶¶ 2–4, 15–17, 131 N.M. 355, 36 P.3d 446 (holding that evidence was sufficient to support DWI conviction where the defendant smelled of alcohol and had bloodshot, watery eyes; admitted to having consumed two beers; refused to consent to FSTs and blood alcohol tests; was uncooperative; and appeared to be intoxicated). Although Defendant contends that the evidence can be viewed as

consistent with a finding of innocence, "[t]he test is not whether substantial evidence would support an acquittal, but whether substantial evidence supports the verdict actually rendered." *Neal*, 2008–NMCA–008, ¶ 19, 143 N.M. 341, 176 P.3d 330 (internal quotation marks and citation omitted). Moreover, "[c]ontrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [a d]efendant's version of the facts." *State v. Rojo*, 1999–NMSC–001, ¶ 19, 126 N.M. 438, 971 P.2d 829. Finally, any alleged inconsistencies in the testimony of Kirby or Enyart were for the jury to resolve at trial. *See State v. Hughey*, 2007–NMSC–036, ¶ 16, 142 N.M. 83, 163 P.3d 470 ("It is the role of the factfinder to judge the credibility of witnesses and determine the weight of evidence.").

## Scientific Testimony

{19} Defendant argues that the court erred in admitting Enyart's testimony regarding the significance of the HGN test as it related to BAC. We review an evidentiary ruling of the metropolitan court for abuse of discretion. *Soto*, 2007–NMCA–077, ¶ 10, 142 N.M. 32, 162 P.3d 187. A trial court abuses its discretion when its ruling is clearly contrary to the logic and effect of the facts and circumstances, or to the reasonable, probable, and actual deductions that may be drawn from them. *Id.* We agree with the district court that although the trial court abused its discretion in admitting Enyart's testimony, the error was harmless.

{20} Defendant argues that Enyart's reference to a 90% correlation between BAC and the combined results of the three FSTs administered in Defendant's case, including the HGN test, was scientific evidence that was inadmissible under Rule 11–702 NMRA without first qualifying Enyart as an expert and establishing the scientific reliability of the FSTs. We agree. "[I]t is error to admit expert testimony involving scientific knowledge unless the party offering such testimony first establishes the evidentiary reliability of the scientific knowledge." *State v. Torres*, 1999–NMSC–010, ¶ 24, 127 N.M. 20, 976 P.2d 20 (citing *State v. Alberico*, 116 N.M. 156, 166–69, 861 P.2d 192, 202–05

(1993)); *see* Rule 11–702 (providing foundation requirements for expert testimony). Our case law is clear: the results of the HGN test are scientific evidence that cannot be admitted without first establishing the proper foundation. *Torres*, 1999–NMSC–010, ¶¶ 22, 23, 33, 127 N.M. 20, 976 P.2d 20. Thus, in order for Enyart's testimony to be admissible, the State needed to lay a sufficient foundation that a motorist's HGN test results, in combination with the walk and turn and one leg stand test results, are scientifically valid means to determine the motorist's BAC. The record, however, is devoid of such foundation. Accordingly, admission of Enyart's 90% correlation testimony was error.

{21} The State contends that Enyart merely repeated the NHTSA's finding and therefore did not proffer expert testimony subject to the foundational requirements of Rule 11–702. We read *Torres* to mean, however, that HGN results are never to be used to predict BAC in an evidentiary manner without a proper foundation. Enyart offered the NHTSA correlation statistic in the context of explaining to the jury her opinion that Defendant was driving while intoxicated and why she placed him under arrest. Accordingly, Enyart was erroneously allowed to testify to the jury that it had been scientifically established that Defendant's performance on the three FSTs showed a likelihood in the ninetieth percentile that his BAC was over the legal limit. Enyart's testimony ventured into the realm of expert testimony and should not have been admitted without a proper foundation.

{22} Having so held, we nonetheless deem the court's error to have been harmless.

> For an error to be deemed harmless, there must be: (1) substantial evidence to support the conviction without reference to the improperly admitted evidence, (2) such a disproportionate volume of permissible evidence that, in comparison, the amount of improper evidence will appear so minuscule that it could not have contributed to the conviction, and (3) no substantial conflicting evidence to discredit the State's testimony.

*State v. Duffy*, 1998–NMSC–014, ¶ 38, 126 N.M. 132, 967 P.2d 807 (internal quotation marks and citation omitted), *modified on other grounds by State v. Gallegos*, 2007–NMSC–007, ¶ 17, 141 N.M. 185, 152 P.3d 828.

{23} We established above that there was substantial evidence to support Defendant's conviction without reference to Enyart's improperly admitted testimony. *See Duffy*, 1998–NMSC–014, ¶ 38, 126 N.M. 132, 967 P.2d 807. Moreover, we hold that the evidence described above amounts to such a disproportionate volume of permissible evidence that, in comparison, the amount of improper evidence appears so minuscule that it could not have contributed to the conviction. *See id.* We agree with the district court that the testimony as to Defendant's driving, signs of intoxication, admission of drinking, performance on the FSTs, and refusal to take a breath test constitute overwhelming evidence of his guilt when compared to the improperly admitted testimony.

{24} Finally, there was no substantial conflicting evidence to discredit the State's testimony regarding Defendant's impairment. *See id.* Defendant's testimony corroborated the testimony of Kirby and Enyart in certain critical respects. He admitted that he had been drinking and that he refused to take a breath alcohol test after being warned of the consequences. Although Defendant's version of events contradicted the testimony of the officers in that they testified that he was obviously intoxicated and became belligerent and he testified that he was not intoxicated and that it was the officers who were mistreating him, he does not overcome what the State argued in closing—that the officers had no reason to lie while Defendant had every reason to do so, and he does not explain in his briefing how the erroneously admitted evidence was particularly prejudicial under the circumstances of this case. Instead, he relies on *State v. Gardner*, 1998–NMCA–160, ¶ 21, 126 N.M. 125, 967 P.2d 465, where we said that "when the only scientific evidence presented at trial was admitted in error, the court cannot say that the effect is harmless." However, in that case and the case on which it relied, *State v. McCaslin*, 894 S.W.2d 310 (Tenn.Crim.App.1994), the evidence was a breath card that showed the defendants' breath alcohol content to be twice the legal limit. *Gardner*, 1998–NMCA–160, ¶ 14, 126 N.M. 125, 967 P.2d 465; *McCaslin*, 894 S.W.2d at 312. In contrast, here, there was no definitive breath score, and the testimony was of probabilities of a person being at the legal limit. Contrary to the dissent's suggestion, we do not believe a jury would have understood Enyart's testimony to mean that Defendant was guilty of an uncharged offense, the per se offense on which the jury was not instructed.

{25} Defendant argues that because no breath score was admitted in this case, the effect of the erroneously admitted testimony was to give the jury the impression that the FSTs done in the parking lot gave the officer a scientifically reliable basis for finding that there was a 90% likelihood that Defendant's breath score was over the legal limit. However, evidence concerning Defendant's BAC was not necessary to convict him of DWI under New Mexico's statute, which provides simply that "[i]t is unlawful for a person who is under the influence of intoxicating liquor to drive a vehicle within this state." Section 66–8–102(A). The jury was not asked to make any finding regarding Defendant's BAC. *See Neal*, 2008–NMCA–008, ¶ 27, 143 N.M. 341, 176 P.3d 330 ("The Legislature was not concerned with the amount of alcohol in the defendant's body when enacting Subsection (A); rather, it was concerned with the effect or influence of the alcohol on the defendant's ability to drive."). Enyart's testimony concerning a correlation between HGN results and BAC therefore could not have contributed to Defendant's conviction because it was not relevant to any fact the jury was asked to decide. "The jury is presumed to follow the court's instructions." *State v. Gonzales*, 113 N.M. 221, 230, 824 P.2d 1023, 1032 (1992). We presume that, in accordance with the trial court's instructions, the jury convicted Defendant only after finding beyond a reasonable doubt that he was under the influence of alcohol under Section 66–8–102(A).

## CONCLUSION

{26} We affirm.

{27} **IT IS SO ORDERED.**

I CONCUR: CELIA FOY CASTILLO, Judge.

RODERICK T. KENNEDY, Judge (concurring in part and dissenting in part).

KENNEDY, Judge (concurring in part and dissenting in part).

{28} The majority is correct in finding that Enyart's testimony about probabilities is error. In the absence of a chemical test result, she answered the prosecutor's question about the "probability that [Defendant] would be at or above the legal limit" by testifying that "[d]epending on which study you look at" the field sobriety tests put such a probability "in the ninetieth percentile." The testimony provided a numerical value for the probability of Defendant's guilt of a crime with which he was not charged, since he was not charged with a per se offense and in fact was charged under Section 66–8–102(D) with refusing a chemical test. Enyart testified about three studies conducted by NHTSA "for over twenty years" that establish percentage probabilities of the correct prediction of BACs at or above the legal limit. *See State v. Lasworth,* 2002–NMCA–029, ¶¶ 2–4, 131 N.M. 739, 42 P.3d 844 (discussing these studies). She also testified about studies of the three standardized FSTs (SFSTs) and the probability of each test predicting a BAC above the legal limit. She testified about clues from each test and correlations among them. In the course of seventeen pages of trial transcript, she suffused her testimony about the facts of Defendant's bleak physical performance on the SFSTs with an aura of scientific process supported by scientific research that we hold even one test—the HGN—could not meet for admissibility. Defendant objected to this testimony but was overruled.

{29} The State, as pointed out in the majority opinion, defends this error, saying that Enyart just "repeated the NHTSA's finding." Repeating the facts asserted out of court by another and expecting such facts to be regarded as true seems to be the essence of hearsay. Rule 11–801(C) NMRA.

{30} Enyart is unequivocally not an expert witness qualified to make these assertions.

Her use of terminology is faulty. Stating that a probability would exist in the "ninetieth percentile" of a group of probabilities does not equate with a 90% probability of the corresponding proposition's truth, or put another way, that the proposition is likely to be true 90% of the time. NHTSA refers specifically to the accuracies of the tests. *See, e.g.,* J. Stuster and M. Burns, *Validation of the Standardized Field Sobriety Test Battery at BACs Below 0.10 Percent,* Final Report, no. DOT HS 808 839, U.S. Dep't of Transportation, NHTSA (1998), p. 25, *available at* http://www.dwirob.com/articles/1998% 20San% 20Diego% 20Study.pdf.[1] In stating that Defendant's BAC was, to a high percentage of certainty, "above the legal limit," Enyart injected a legal conclusion into prejudicial and irrelevant evidence for consideration by the jury under a false cloak of scientific terminology and expertise. *Lasworth,* 2002– NMCA–029, ¶ 25, 131 N.M. 739, 42 P.3d 844 (noting that to the extent that SFSTs are validated "solely as a means of discriminating between BACs at or above a given level," they are not included by New Mexico statute for forensic determination BAC).

{31} The remaining question then is not whether it was error that a witness exceeded her qualifications as a witness and recited hearsay that further testified to probabilities of Defendant's guilt of an uncharged per se offense—because we have said that this was error—but whether such behavior was harmful error in light of the other evidence. This balance is hard to calculate but is more susceptible to a fast answer when the other evidence of guilt was sufficient to justify convicting the defendant independent of the tainted testimony, as I concur that it was here.

{32} In a DWI trial where there is no chemical test, however, a strong witness who testifies repeatedly about the odds of a defendant being "above the legal limit" is testifying to a legal conclusion of guilt. I do not believe that the jury can separate a proper basis for finding guilt from the improper one presented by the State. In *State v. Huff,*

---

1. "Estimates at ... the 0.08 level [for BAC] were accurate in 91 percent of the cases, or as high as 94 percent if explanations for [some] of the false positives are accepted."

1998–NMCA–075, 125 N.M. 254, 960 P.2d 342, we held that the prosecutor's purposeful eliciting of testimony concerning PTSD based on past sexual abuse that did not involve the defendant would have allowed the jury to make an unreasonable inference and was a course of misconduct likely to lead to a mistrial. *Id.* ¶ 24. Statistical testimony that lacks foundation and that can clearly distract the jury from its function of weighing the proper evidence of guilt encourages a departure from the legitimate elements of proof. *See People v. Collins,* 68 Cal.2d 319, 66 Cal. Rptr. 497, 438 P.2d 33, 38 (1968). Cases that express concerns about evidence of statistical probabilities couch such worry in terms that the evidence will become a measure of a Defendant's guilt. *See, e.g., State v. Boyd,* 331 N.W.2d 480, 483 (Minn.1983) (noting the danger of a jury using population frequency evidence in such a manner).

{33} Enyart's testimony consisted of a percentage probability that a per se criminal offense was committed as a matter of law. Since the connection is explicit, it is even more dangerous. If the testimony elicited by the State had not been couched as a 90% probability that Defendant was guilty of a per se offense, I could perhaps regard this as harmless error. Under *Huff,* factually prejudicial testimony is unquestionably sufficient for a mistrial. *See* 1998–NMCA–075, ¶ 25, 125 N.M. 254, 960 P.2d 342. Prosecutors and police officers should avoid such overreaching so as to reduce the possibility of snatching defeat from the jaws of victory. Informing the jury of a legal conclusion as to Defendant's guilt of a closely related but uncharged offense, as was done in this case, invades the jury's ability to sufficiently decide the true facts. As a result, I regard this error as harmful to a point that should require retrial.